LYON LEGAL, P.C.
DEVON M. LYON, ESQ. (State Bar No. 218293)
  Email: d.lyon@lyon-legal.com
MATTHEW B. PEREZ, ESQ. (State Bar No. 326350)
  Email: m.perez@lyon-legal.com
1154 E. Wardlow Rd.
Long Beach, CA 90807
(562) 216-7382 Telephone
(562) 216-7385 Facsimile

Attorneys for Plaintiff,
**BRIANNE "BRIE" GALICINAO**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIANNE "BRIE" GALICINAO, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA, a public entity; and DOES 1-10, inclusive,<br><br>        Defendants. | Case No.: 2:22-cv-08057<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Violation of Title IX – Unequal Allocation of Athletic Financial Assistance;**<br>2. **Violation of Title IX – Unequal Allocation of Athletic Treatment and Benefits**<br>3. **Failure to Provide Equal Pay in Violation of the Equal Pay Act of 1963 (29 U.S.C. § 206(d));**<br>4. **Discrimination Based Upon Sex/Gender (Cal. Gov. Code §§ 12940 *et seq.*);**<br>5. **Retaliation in Violation of FEHA (Engagement In A Protected Activity);**<br>6. **Violation of Labor Code § 1102.5; and**<br>7. **Retaliation Under the Fair Labor Standards Act.**<br><br>**DEMAND FOR JURY TRIAL** |

/ / /

/ / /

/ / /

# I.

## **INTRODUCTION**

1.      Plaintiff, Brianne ("Brie") Galicinao, was the Head Coach for the University of California, Santa Barbara ("UCSB"), Women's Softball Team from 2007 until her employment with UCSB was terminated at the end of the 2022 season. As the Head Coach for UCSB, Coach Galicinao was twice named the Big West Coach of the Year and ranked ninth in the Big West history with 343 victories and 12th with 138 conference wins.

2.      Throughout her career with UCSB, Coach Galiciano was distinctly aware of the disproportionate funding between men's and women's sports at UCSB and the Big West Conference.  At UCSB specifically, the softball facilities were inferior to the UCSB baseball facilities including, inferior batting cages, dugouts, and stadium.  Many visiting coaches have complained about worn out batting cage nets rendering them dangerous to take batting practice.

3.      In addition to disproportionate program funding, the Regents provided the baseball program with a larger coaching staff and paid the baseball staff far in excess of what was paid to softball staff.  For example, in 2020, Coach Galicinao was paid $86,761 and the head baseball coach was paid $221,197.

4.      During the 2022 softball season, Coach Galicinao decided to compile salary information and consulted with Alysia Hendricks about the inequalities between the UCSB baseball and softball programs. After several conversations with visiting coaches, Coach Galicinao compiled coaching salary information for UCSB and other Big West programs which (including those at UCSB) revealed glaring inequities between men's and women's programs and men's and women's coaching compensation.

/ / /

/ / /

/ / /

COMPLAINT FOR DAMAGES
2

5.     On March 31, 2022, Coach Galicinao formally presented this information to Interim Athletic Director, Kelly Barsky, and Sport Supervisor, Bryan Cornet. Coach Galicinao coined the presentation "Operation Close the Gap," which displayed the glaring pay disparities between female and male coaches at UCSB and in the Big West Conference.  In response to that presentation, there were no follow ups, questions, nor investigations into the illegal Title IX and Equal Pay violations. After notice of her intent to file this lawsuit was sent to UCSB, there was a token response from the Title IX and Sexual Harassment Policy Compliance office which resulted in nothing.

6.     At the end of the 2022 season, after 15 years as the head softball coach at UCSB, Coach Galicinao was notified that her coaching contract was not going to be renewed (i.e. termination) under the pretext that UCSB was "going in a different direction."

## II.

## TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

7.     "No person in the United States shall, on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

8.     Fifty years ago, President Richard Nixon signed into law, 20 U.S. Code § 1681, Title IX, which stated that no one should be excluded from participation or face discrimination on the basis of sex in any education programs or activity receiving federal assistance.

9.     This is a discrimination action against the Regents of the University of California ("Regents") (i.e. UCSB) for depriving its softball program equal athletic funding in violation of Title IX of the Education Amendments of 1972 ("Title IX") and the Equal Pay Act of 1963. Specifically, the Regents have not provided its female softball team equal athletic funding for several years, failed to provide equal resources, and failed to properly pay its staff. This lawsuit seeks to make the Regents

(and encourage other schools around the country) to treat its female softball team as equal to other sports (including men's baseball) and provide it the necessary resources it has been deprived to succeed.

10.     Title IX prohibits all educational institutions receiving federal funds, including Regents, from discriminating against women (and men) on the basis of their sex.

11.     As the United States Department of Education's Office for Civil Rights ("OCR"), responsible for interpreting and enforcing Title IX, explained in 1998, "With regard to athletic financial assistance, the regulations promulgated under Title IX provide that, when a college or university awards athletic scholarships, these scholarship awards must be granted to 'members of each sex in proportion to the number of students of each sex participating in intercollegiate athletics.' 34 C.F.R 106.37(c)." Office for Civil Rights, U.S. Department of Education ("DOE"), *Dear Colleague Letter* at 2 (July 23, 1998).

12.     The Equity in Athletics Disclosure Act (EADA) requires colleges and universities that receive federal financial assistance and that sponsor intercollegiate athletics to report annually to the Department of Education on athletics participation, staffing issues, revenues, and expenses.

13.     Based on information and belief, the Regents have not granted athletic team funding to its female and male varsity athletes in proportion to the number of students of each sex participating in intercollegiate athletics for more than a decade and is not doing so now.

14.     The Regents have regularly granted and is granting its female varsity student-athletes much less – and its male varsity student-athletes much more – athletic funding than they would have received if Regents had granted such aid funding in proportion to the number of students of each sex participating in intercollegiate athletics.

/ / /

15.     As compared to male varsity student-athletes, the Regents continue to disproportionately and unequally allocate less athletic funding to varsity female student-athletes.

16.     Defendant's actions have caused and are causing harm to Plaintiff (and the student-athletes Plaintiff coached) and constitutes intentional, prohibited discrimination based on sex in violation of Title IX and the Federal Equal Pay Act and the implementing regulations at 34 C.F.R. Part 106.

17.     Plaintiff has been and will continue to be harmed by this past and ongoing sex discrimination in Regents' varsity athletics program.

18.     This lawsuit seeks to end Defendant Regents' long standing, ongoing discrimination against female athletics (particularly as it relates to the softball program) in the provision of athletic financial funding, require Defendant to fairly compensate its female coaches, and ensure Regents' future compliance with Title IX's equal athletic requirements.

### III.

### THE EQUAL PAY ACT

19.     In 1960, women earned less than two-thirds of what their male counterparts were paid; the disparity between men and women of color was even greater.  During the administration of President John F. Kennedy, Esther Peterson, head of the Women's Bureau of the Department of Labor, and former First Lady Eleanor Roosevelt advocated for laws to correct these disparities.  Despite opposition from business groups, Congress passed the Equal Pay Act in 1963 as an amendment to the Fair Labor Standards Act of 1938.

20.     The Equal Pay Act requires that men and women in the same workplace be given equal pay for equal work.  The jobs need not be identical, but they must be substantially equal.  All forms of pay are covered by this law, including salary, overtime pay, bonuses, stock options, profit sharing and bonus plans, life insurance, vacation and holiday pay, cleaning or gasoline allowances, hotel accommodations,

reimbursement for travel expenses, and benefits.  If there is an inequality in wages between men and women, employers may not reduce the wages of either sex to equalize their pay.

21.    On April 20, 2005, Senator Hilary Clinton, Representative Rosa DeLauro and Senator Tom Daschle proposed the Paycheck Fairness Act to increase the penalties for equal pay violations and to prohibit retaliation against whistle-blowers.

22.    On January 29, 2009, President Obama signed the Lilly Ledbetter Fair Pay Act into law.  The Act was constructed after its namesake endured discrimination for years but was unaware of it until long after she retired because her former employer prohibited employees from sharing or discussing information on their wages.

23.    On March 31, 2022, Plaintiff presented the Regents with a detailed chart identifying the glaring deficiencies in compensation between male and female coaches ("Operation Close The Gap").  As it relates to Plaintiff specifically, despite Coach Galicinao's years of experience and accomplishments, the UCSB head baseball coach was paid more than double Plaintiff's salary.

**IV.**

**VENUE AND JURISDICTION**

24.    This action arises under among other laws, the Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, and the regulations and policies promulgated pursuant to that law.

25.    This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

26.    Declaratory Relief is authorized pursuant to 28 U.S.C. §§ 2201and 2202 to obtain the correct interpretation of the legal requirements described in this Complaint, which is necessary and appropriate to determine the parties' respective rights and duties.

27.     Venue is proper in this District because all or a substantial portion of the events forming the basis of this action occurred in this District. Defendant is located in this District and Plaintiff worked in this District.

28.     On October 17, 2022, Plaintiff filed a Complaint with the California Department of Fair Employment and Housing ("DFEH").  On October 17, 2022, Plaintiff received a Right to Sue Letter from the DFEH exhausting the requirement by which to file her claim of gender discrimination and retaliation for engagement in a protected activity.

29.     On July 15, 2022, Plaintiff submitted a Government Code § 910 claim seeking to exhaust any applicable tort claims.  The claim was denied by Defendant on July 28, 2022.

30.     Plaintiff has satisfied all conditions precedent, if any, to the filing of this suit.

## V.

## **PARTIES**

31.     Plaintiff, Dr. Brie Galicinao, is a former employee/coach of the UCSB.

32.     The Regents is a public entity existing under the laws of the State of California and is a general law city as defined by Government Code § 36501.

33.     The Regents have a duty to comply with Title IX and grant athletic financial funding to its female sports teams proportional to the athletic financial funding granted to the male sports teams.

34.     Defendant Regents is a recipient of federal funds and is required to comply with Title IX and all of its implementing regulations.

35.     Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the regulations adopted pursuant to 34 C.F.R. Part 106, Regents must provide equal opportunities for women and men in every program Regents offers, including equal athletic financial funding to females and males in Regents' intercollegiate athletics programs.

36.     The Regents is an employer within the State of California and is obligated to comply with California State law including, Labor Code section 1102.5 and the California Fair Employment and Housing Act ("FEHA") codified in California Government Code section 12900 et seq.

37.     The Regents have a duty to comply with the Equal Pay Act and pay its employees equal pay for equal work regardless of gender.

38.     The true names, capacities or involvement, whether individual, corporate, governmental or associate, of the Defendants named herein as DOE 1 through 10, inclusive are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff prays for leave to amend this Demand to show the true names and capacities when the same have been finally determined. Plaintiff is informed and believes, and upon such information and belief alleges thereon, that each of the Defendants designated herein as DOE in negligently, intentionally, strictly liable or otherwise legally responsible in some manner for the events and happenings herein referred to, and negligently, strictly liable intentionally or otherwise caused injury and damages proximately thereby to Plaintiff, as is hereinafter alleged.

39.     Plaintiff is informed and believes that, at all relevant times herein, Defendants engaged in the acts alleged herein and/or condoned, permitted, authorized, and/or ratified the conduct of its employees and agents, and other Defendants and are vicariously or strictly liable for the wrongful conduct of its employees and agents as alleged herein.

40.     Plaintiff is informed and believes that, and on that basis alleges that, each of the Defendants acted, in all respects pertinent to this action, as the agent or employee of each other, and carried out a joint scheme, business plan, or policy in all respect thereto and, therefore, the acts of each of these Defendants are legally attributable to the other Defendants, and that these Defendants, in all respects, acted

as an employer and/or joint employers of Plaintiff in that each of them exercised control over his wage payments and control over his duties.

41.    Plaintiff is informed and believes that, and on that basis alleges that, at all relevant times, each and every Defendant has been the agent, employee, representative, servant, master, employer, owner, agent, joint venture, and alter ego of each of the other and each was acting within the course and scope of his or her ownership, agency, service, joint venture, and employment.

42.    At all times mentioned herein, each and every Defendant was the successor of the other and each assumes the responsibility for the acts and omissions of all other Defendants.

## VI.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

43.    Plaintiff repeats and re-alleges each and every allegation by reference contained in all previous paragraphs.

44.    Title IX says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

45.    Because the Regents receive federal financial assistance, its varsity athletic program is subject to Title IX and Regents must comply with Title IX's requirements. 20 U.S.C. § 1687.

46.    When schools segregate their varsity athletic programs on the basis of sex as the Regents does, their violations of Title IX in those programs constitute intentional discrimination. *See Neal v. Board of Trustees of the Cal. State Univs.*, 198 F. 3d 763, 772 n.8 (9th Cir. 1999).

47.    Applying Title IX to intercollegiate athletics, OCR has adopted regulations requiring educational institutions receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

48.     The regulations, codified at 34 C.F.R. Part 106 (the "Regulations") are enforced by OCR.

49.     In 1979, OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics at 44 Fed. Reg. 71,413 (Dec. 11, 1979)(the "OCR Policy Interpretation").

50.     The OCR Policy Interpretation sets forth three areas of compliances under Title IX as it relates to college sports: (1) equal accommodation of student interests and abilities; (2) equal athletic financial assistance; and (3) equal treatment and benefits.

51.     Compliance regarding athletic financial assistance is assessed pursuant to 34 C.F.R. § 106.37(c), which provides:

(1) To the extent that a recipient awards athletic scholarships or grants in aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants in aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

52.     The OCR Policy Interpretation states, among other things, its interpretation of the athletic financial aid provision quoted above:

The Policy – The Department will examine compliance with this provision of the regulation primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The Department will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic programs and comparing the results. Institutions may be found in compliance if this comparison results in substantially equal

amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors . . .

Application of the Policy – This section does not require a proportionate number of scholarships for men and women or individual scholarships of equal dollar value. It does mean that the total amount of scholarship aid made available to men and women must be substantiality proportionate to their participation rates.

Because Title IX, and its implementing Regulations are federal law, NCAA and conference rules cannot justify violations of them. The Title IX Regulations state: "The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization … or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives Federal financial assistance." 34 C.F.R. 106.6(c).

53. The Regents is a member of the NCAA, and it participates in Division I athletics, the highest level of intercollegiate competition. Regents offer athletic financial funding to members of its varsity athletic teams.

54. For the past several decades, the Regents has sponsored men's and women's varsity Division I intercollegiate athletic teams, segregated based on sex.

55. The Regents fails to provide athletic financial funding to its female varsity student athletes in proportion to their athletic participation rates, and accordingly, intentionally discriminates against female softball players in violation of Title IX.

56. At all times relevant to this matter, Defendant was and is responsible for ensuring that Regents complied with Title IX and provided proportional athletic financial funding to its female student-athlete programs.

/ / /

57.     For more than a decade, female programs (specifically softball) at the Regents (UCSB) have been deprived of athletic financial funding in proportion to their participation in Regents' athletics, and the difference in the proportion has always been greater than 1%.

58.     Plaintiff was the Head Coach of the UCSB Softball Team from 2007 until she was terminated in 2022.

59.     During her tenure, Plaintiff was a two-time Big West Conference Coach of the Year.

60.     Plaintiff also has the most 30-win seasons in the UCSB's program history.

61.     In addition to her on field duties, she worked with all aspects of the program, including recruiting, fundraising, and monitoring players' academics.

62.     For more than a decade, Plaintiff became more and more aware of the inequality between her softball program and the UCSB baseball program. These inequalities included the vast difference in resources, including, but not limited to, coaching staff, support staff, field maintenance, equipment, and apparel between each program.

63.     For example, the coaches in the softball program were not only expected to manage the team but also provide field and equipment upkeep duties. The coaches of the baseball team were not tasked with these responsibilities since they are staffed with a designated field person and interns.

64.     Over the past couple of years, Plaintiff began to regularly hear from other softball coaches that the immense difference and gap between the men's and women's programs at UCSB was alarming.  Specifically, coaches were fearful to allow their players to take batting practice in the old and unsafe batting cages.

65.     In early February 2022, Plaintiff took the initiative to research the significant differences between the UCSB baseball and softball programs. Plaintiff began preparing a presentation after speaking with another prominent softball coach

about how poorly the UCSB softball team was funded, especially compared to the baseball team.

66.     On March 31, 2022, Plaintiff had a meeting with Interim Athletic Director Kelly Barsky and Sport Supervisor Bryan Cornet. Plaintiff created a presentation called, "Close the Gap", which focused on the pay disparity between the coaches of the sports programs at not only UCSB but also the other universities across the State of California. In addition to the discernible pay gap, Plaintiff further illustrated that the UCSB softball program received far less funding, a smaller staff, and less equipment than the baseball program.

67.     Plaintiff's presentation clearly brought into light UCSB's violation of the Equal Pay Act, Title IX, and Gender Discrimination under the California Fair Employment and Housing Act ("FEHA").

68.     Following the presentation, Mrs. Barsky stated that due to the large amount of information provided by Plaintiff she would need additional time to review.

69.     Following the meeting, Plaintiff was not provided any updates, follow up, or status of any investigation in response to the "Close the Gap" presentation.

70.     After Coach Galicinao's presentation, she continually requested more support in field maintenance, safer equipment and facilities, and general support for the softball program. These repeated complaints fell onto deaf ears.

71.     On June 2, 2022, Plaintiff was called into a meeting with Mrs. Barsky and Associate Athletic Director of Business Operations, Sandra Featherson. During this meeting, Mrs. Barsky terminated Plaintiff under the pretext that the program was going "in a different direction."

72.     Plaintiff was shocked by her termination as it was only one day before the softball team banquet, and shortly after she had presented comparison information related to program funding and coaching salaries.

/ / /

73.    Plaintiff later learned that her Sports Supervisor, Mr. Cornet, was completely unaware that she was terminated.

74.    Plaintiff believes and thereon asserts that her termination was a result of her complaints about UCSB's violations of the Equal Pay Act of 1963, Title IX, and Gender Discrimination and Retaliation in response to her "Close the Gap" presentation.

## VII.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Title IX – Unequal Allocation of Athletic Financial Assistance

75.    Plaintiff hereby incorporates by reference and re-alleges paragraphs 1-73 as though fully set forth herein.

76.    Defendant provides athletic financial funding to some of its male and female athletic programs.

77.    Under Title IX and 34 C.F.R. § 106.37, as interpreted by OCR, Defendant must provide athletic financial funding to its female and male student-athletes in proportion to the number of students of each sex participating in intercollegiate athletics.

78.    Defendant has not provided and does not provide athletic financial funding to UCSB's female and male student-athletes in proportion to the number of students of each sex participating in intercollegiate athletics.

79.    Defendant has provided and continues to provide UCSB's female programs much less – and its male programs much more – athletic financial funding than they would have received if UCSB had granted such aid in proportion to the number of students of each sex participating in intercollegiate athletics.

/ / /

/ / /

/ / /

80.    Defendant's failure to provide UCSB's female student-athletes with athletic financial funding in proportion to the number of female student-athletes participating in intercollegiate athletics constitutes sex discrimination in violation of Title IX and 34 C.F.R. § 106.37.

81.    Individuals harmed by violations of Title IX may seek and recover monetary damages, injunctive relief to prevent continuing discrimination, and declaratory relief.

82.    Plaintiff has been harmed by Defendant's failure to provide UCSB's female student-athletes with athletic financial funding in proportion to the number of female student-athletes participating in intercollegiate athletics. Such harm includes, but is not limited to, lost athletic financial funding, poor facilities, small coaching staff and being subjected to sex discrimination. Accordingly, Plaintiff is entitled to the requested relief herein.

## SECOND CAUSE OF ACTION

### Title IX - Unequal Allocation of Athletic Treatment and Benefits

83.    Plaintiff hereby incorporates by reference and re-alleges paragraphs 1-82 as though fully set forth herein.

84.    Defendant provides its varsity student athletes with certain benefits, including, but not limited to, equipment, supplies, uniforms, locker rooms, scheduling for competitions, transportation, coaching, tutoring, and academic support services, practice and competition facilities, training services, weight training, and other services.

85.    Under Title IX and 34 C.F.R. § 106.41(c), Defendant must allocate these benefits equally between male and female athletes. On a program-wide basis, it must provide female athletes with benefits that are comparable to those that it provides to male athletes.

/ / /

/ / /

COMPLAINT FOR DAMAGES

15

86.     Defendant fails to provide female student athletes with an equal allocation of these benefits. This failure constitutes disparate treatment and sex discrimination in violation of Title IX.

87.     Defendant has not sufficiently allocated the amount of benefits (or the resources and budgets necessary to provide the benefits to female athletes).

88.     Defendant fails to provide equal athletic benefits, including but not limited to the provision of equipment and supplies, compensation for coaches, and administrative support.

89.     Plaintiff has been harmed by Defendant's failure to provide its female student athletic programs with an equal allocation of benefits and resources. Such harm includes a lost competitive advantage and less quality in participation opportunities. It also includes emotional distress, pain, anxiety, and other damages to be proved at trial. Accordingly, Plaintiff is entitled to the relief requested herein.

## THIRD CAUSE OF ACTION

**Failure to Provide Equal Pay in Violation of the Equal Pay Act of 1963**

**(29 U.S.C. § 206(d))**

90.     Plaintiff hereby incorporates by reference and re-alleges paragraphs 1-89 as though fully set forth herein.

91.     At all times alleged, the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("Equal Pay Act") was in full effect and binding on Defendants.

92.     Pursuant to the Equal Pay Act, Plaintiff has a legal right to be compensated equally as her male coworkers in the same establishment for equal work on jobs requiring substantially equal skill, effort, and responsibility, performed under similar working conditions.

93.     Defendant violated the provisions of the Equal Pay Act when Defendant failed to provide equal compensation to Plaintiff as her male coworkers in the same establishment for equal work on jobs requiring substantially equal skill, effort, and responsibility, performed under similar working conditions.

94.     As a direct and proximate result of Defendant's willful violation of the Equal Pay Act, Plaintiff has suffered loss of compensation, bonuses, and benefits all in an amount to be proven at trial.

95.     As a result of Defendant's willful violation of the Equal Pay Act, Plaintiff is entitled to the amount of lost compensation and liquidated damages.

96.     Plaintiff had to retain counsel to vindicate her rights under the Equal Pay Act, as alleged in this Complaint, and is entitled to an award of attorney's fees and costs as provided in 29 U.S.C. § 216(b).

## FOURTH CAUSE OF ACTION

### Discrimination Based Upon Sex/Gender

### (Cal. Gov. Code §§ 12940 *et seq.*)

97.     Plaintiff hereby incorporates by reference and re-alleges paragraphs 1-96 as though fully set forth herein.

98.     At all times relevant, FEHA, specifically California Government Code § 12940(a) protected Plaintiff from discrimination in employment on the basis of her sex/gender.

99.     It is an unlawful employment practice for an employer to discriminate against an employee, including discriminating against an employee in the terms and conditions of employment, based on sex/gender.

100.    The substantial motivating factor for Defendant's discrimination against Plaintiff was because of her sex/gender female.

101.    Defendant unlawfully discriminated against Plaintiff because of her sex/gender with respect to the terms, conditions, and/or privileges of her employment. Defendant's actions toward Plaintiff constitute disparate treatment based on unlawful sex/gender related reasons. Such discrimination was a substantial motivating reason in causing Plaintiff's damages.

/ / /

/ / /

102.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered an adverse employment action (termination from employment) and suffered and continues to suffer economic and non-economic damages for which Defendant is liable, including but not limited to emotional distress, humiliation, loss of reputation, loss of promotion, and loss of compensation, bonuses, benefits, and other privileges and conditions of employment in an amount to be proven at trial.

103.   Plaintiff had to retain counsel to vindicate her rights under FEHA, as alleged in this Complaint, and is entitled to an award of attorney's fees and costs as provided in California Government Code §12965(b).

## FIFTH CAUSE OF ACTION

### Retaliation for Opposing Sex/Gender Discrimination in Violation of FEHA
### (Cal. Gov. Code §§ 12940 *et seq.*)

104.   Plaintiff realleges and incorporates by reference paragraphs 1-103 as though fully set forth herein.

105.   At all times relevant, California Government Code § 12940 *et seq.* was in full force and effect and binding upon Defendant.

106.   Pursuant to California Government Code § 12940(b), Plaintiff had a legal right to protest discrimination in the workplace, without retaliation from Defendant.

107.   As a result of Plaintiff's protest and opposition to the unlawful conduct of Defendant, Plaintiff was retaliated against by Defendant and suffered an adverse employment action (termination from employment).

108.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered and continues to suffer economic and non-economic damages for which Defendant is liable, including but not limited to emotional distress, humiliation, loss of reputation, loss of promotion, bonuses, benefits, and other privileges and conditions of employment in an amount to be proven at trial.

/ / /

109.   Plaintiff had to retain counsel to vindicate her rights under FEHA, as alleged in this Complaint, and is entitled to an award of attorney's fees and costs as provided in California Government Code § 12965(b).

## SIXTH CAUSE OF ACTION

### Violation of Labor Code Section 1102.5

110.   Plaintiff realleges and incorporates by reference paragraphs 1-109 as though fully set forth herein.

111.   At all times relevant, California Labor Code § 1102.5 was in full force and effect and binding upon Defendant.

112.   Pursuant to California Labor Code § 1102.5, Plaintiff had a legal right to disclose unlawful acts to those with authority to investigate, discover, or correct such violations without retaliation from Defendant.

113.   Plaintiff reported and disclosed unlawful acts prohibited by FEHA, Title IX, and the Equal Pay Act (i.e. "Operation Close The Gap"), among other laws, to executives, managers, and superiors employed by Defendant.

114.   As a result of Plaintiff's reporting and disclosure of unlawful acts, Defendant retaliated against Plaintiff.

115.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered and continues to suffer adverse employment actions (termination from employment) resulting in economic and non-economic damages for which Defendant is liable, including but not limited to emotional distress, humiliation, loss of reputation, loss of promotion, and loss of compensation, bonuses, benefits, and other privileges and conditions of employment in an amount to be proven at trial.

116.   Plaintiff had to retain counsel to vindicate her rights under the Labor Code, as alleged in this Complaint, and is entitled to an award of attorney's fees and costs as provided in Labor Code § 1102.5(j).

/ / /

/ / /

**SEVENTH CAUSE OF ACTION**

**RETALIATION UNDER THE FLSA**

117.    Plaintiff realleges and incorporates by reference the paragraphs above.

118.    Plaintiff in this case has taken advantage of the FLSA rights by filing of this action.

119.    Under 29 U.S.C. § 215(a)(3), it is unlawful to take an adverse employment action, including termination of employment, against an employee for taking advantage of her FLSA rights.

120.    Plaintiff made efforts to prevent Title IX and Equal Pay Act violations, but Defendant refused to listen or address these issues.  In retaliation for Plaintiff's Complaints.   She suffered an adverse employment action (termination from employment).

121.    Plaintiff has been damaged because she has been terminated as the Head Softball Coach as a result of her complaints.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests of this Court the following relief:

1.    For compensatory damages according to proof;

2.    For special damages according to proof;

3.    maintain jurisdiction over this action to monitor Defendant's compliance with this Court's orders;

4.    For attorneys' fees;

5.    For statutory penalties;

6.    For costs of suit incurred herein;

7.    For civil penalties;

8.    For pre-judgment interest;

9.    For post-judgment interest;

10.    For general damages in an amount to be proved;

11.    Injunctive Relief; and

12.    For such other and further relief as the tribunal may deem just and proper.

LYON LEGAL, P.C.

Dated: November 3, 2022      By:    /s/Devon M. Lyon
                                    DEVON M. LYON, ESQ.
                                    MATTHEW B. PEREZ, ESQ.

                                    Attorneys for Plaintiff,
                                    **BRIANNE "BRIE" GALICINAO**